HENRY RANCOURT, *Adm'r v.* BOSTON & MAINE RAILROAD.

*William H. Sleeper* (by brief and orally), for the plaintiff.

*Hughes & Burns* and *Walter A. Calderwood, Jr.* (*Mr. Calderwood* orally), for the defendant.

PAGE, J.   For an understanding of the facts some knowledge of the locus of the accident is necessary.   The points of the compass will be altered in order to make the description simpler, but without changing the relative location of the various objects.

The railroad at Newton Junction runs east and west in a straight line for a distance of over a mile in each direction from the station. There is a very slight grade from east to west. A highway, running north and south, crosses the tracks at grade. West of the highway and north of the tracks is the station. The station platform is of cinders packed against a timber near the northerly, or west-bound, track. This timber extends easterly to a point where there is surfacing. The planking of the crossing extends westerly to the same point. From this point to the general line of the traveled part of the highway, the distance is about eleven feet. Evidence is lacking to show whether or not this eleven-foot space is a part of the highway. There is no unambiguous evidence that it is a part of the premises of the defendant. The defendant does, indeed, maintain a "no parking" sign there, but this would be consistent with the mere intention of keeping people from blocking a publicly maintained highway approach to the station platform. From this surfacing to the point where Mrs. Rancourt's body was found, the distance is no more than six or eight feet.

North of the tracks some thirty feet, and east of the highway, is a building occupied by the post office and store. South of the tracks, and abutting them, about one hundred and fifteen feet easterly of the traveled part of the highway, is the Wingate shoe factory. On the same side of the highway, further south, is the McCarthy house, eighty-five feet from the tracks and about thirty-eight feet easterly of the traveled part of the highway.

There are three tracks at the grade crossing. The northernmost is the west-bound main track. It was on this that the train was traveling when the deceased came into contact with it. Eight feet south of the south rail of the west-bound track is the north rail of the east-bound track. Some nine feet south of the south rail of the east-bound track is the north rail of a side-track. The whole width of the crossing from northernmost to southernmost rails is thirty-three feet. In the middle of the highway, eleven feet north of the northernmost rail, is an automatic flasher signal, with automatic bell. A similar device is located in the middle of the highway eleven feet south of the southernmost rail.

The accident happened at about 8:45 Standard Time in the morning. The weather was fair and clear. The train-schedule called for the Flying Yankee, a fast stream-lined train from Portland to Boston, to pass this station at 8:42. Its usual speed at this point was seventy miles an hour. The next train, west-bound,

was a local due to stop, but only on signal for prospective passengers, at 8:57. The plaintiff claims that the Fying Yankee was nine minutes late, instead of three, but the evidence he adduces of the fact is so slender and so incongruous as not to be worthy of credence against the clear evidence that the train was stopped when a thousand feet west of the station, that it was then backed up to the station, where the engineer got off, went into the station, and reported the accident to the chief train despatcher by telephone. The train then had to remain a further time for the engineer to regain his cab, signal the rear trainman to bring in his flag and for the trainman to reach the train before it started. Since on the undisputed evidence of record the train departed the second time at 8:56, it is clear that the train must have passed the station originally a substantial time prior to 8:51.

The deceased lived south of the tracks and west of the highway. On the morning of the accident, Mrs. McCarthy, sitting in a window on the north side of her house, saw Mrs. Rancourt going towards the crossing. She was then about thirty feet south of the southerly crossing signal, and over forty feet from the nearest rail of the side-track. Already the Flying Yankee was giving the statutory crossing whistle. Mrs. McCarthy could not recall whether the automatic flashers and bells were also working at the moment, but said they were when Mrs. Rancourt reached the side-track. At the side-track there was a wholly unobstructed view of the approaching train.

According to Mrs. McCarthy, Mrs. Rancourt crossed the side-track, looked to the right (there was still an unobstructed view of the train), kept on over the east-bound track, still looking, and walked "much faster" across the west-bound track. The train then hid her from Mrs. McCarthy's view as she was stepping over the last rail. "I didn't really know," she said, "if the woman had got struck or not. She went across the track and I thought possibly she might not have got hit. I see her go over the last track and I didn't know whether she got hit or not until the train went like that and I saw her laying there and when I saw her laying on the ground why I just let a scream out of me, that's all, and I got up and started towards the other side of the house and I fainted."

From this, the only detailed account by a neutral eye-witness, it is clear that if Mrs. Rancourt did in fact get across the tracks without being hit by the head of the train, she was only barely across. It is true that Mrs. McCarthy said, "She got across because the train didn't hit her in my sight so of course she—She got across

the track because the train didn't hit her that I saw, so of course she would have got across, wouldn't she, or I would see the train hit her." But the defect of this argument is that it leaves two possibilities out of consideration. The first is that the curved head of the train might have hidden Mrs. Rancourt from Mrs. McCarthy's sight at the moment she was hit, if she was in fact struck by the right side of the head, as the engineer thought. Second, even if the head of the train did not hit the deceased, she was barely over, and may have been sucked into the side of the train while still in the highway. In neither case, could Mrs. McCarthy see the contact. Her argument from her lack of vision therefore leaves the manner and cause of the contact conjectural. Neither of these possibilities would help the plaintiff. If the second were true, and the deceased was in the highway, her attempt to cross ahead of the train would leave this as much a crossing accident as the first supposition. The plaintiff must show that she reached the platform under her own locomotion, else there could be no special duty of protection such as that relied on.

The station agent saw Mrs. Rancourt as she came to the south flasher, but not beyond, and the only witness other than Mrs. McCarthy who saw her further approach to the tracks was the engineer of the Flying Yankee. He said he saw her when she was about thirty feet south of the west-bound track. The train was then four to five hundred feet from the crossing. The crossing whistle, the flashers and the bells were then all in operation, according to the uncontradicted testimony. Mrs. Rancourt kept on. When ten feet from the west-bound track, she "broke into a run." The engineer, seeing then that she was not going to stop, immediately blew his siren, at two hundred feet, and at one hundred and fifty feet, within half a second, had made a "deadman" application of the brakes and sand, the most effective known, thus reducing his speed shortly by about five miles an hour. He could last see her as she stepped over the south rail of the west-bound track. Since he could have seen her only if she were about five feet ahead of the train, he thought she could no more than clear the head of the train, and his impression was that the impact was about midway of the right half of the head. If this was a crossing accident, the plaintiff has failed to show any fault on the part of the defendant, even under the last clear chance doctrine. *Morier* v. *Hines*, 81 N. H. 48, 51.

In order to prove that the deceased walked onto the station platform, the plaintiff produced the purely negative, and futile, testi-

mony of two people who did not see Mrs. Rancourt on the crossing. One of them, Mrs. Locke, was working at the time in the Wingate factory. On hearing the siren, at the corner of the factory, she turned to her right and looked out of the window, seeing nobody on the crossing. In the second and a half or less from the time when she heard the whistle to the time when the train would have entirely blocked the crossing so that she could not see, things happened quickly, so quickly that, as she testified, the train was "just about across the front part of the depot as I turned." Obviously it is not strange that she did not see Mrs. Rancourt; however the accident happened, whether at the head of the train or on the north side, Mrs. Rancourt would have been invisible. So her testimony is far from proving that Mrs. Rancourt gained the platform while walking.

The other negative witness, Mr. Yeskenevitch, was driving a truck from a house eighty or ninety yards north of the crossing. As he faced the crossing, he saw the lights flash, but saw nobody on the crossing. His failure to see Mrs. Rancourt is easily accounted for. She came up the west side of the highway. North of the crossing, the road bends somewhat to the west. Contiguous to the west side of the traveled part of the highway, at or near the bend, were some bushes which would make his seeing her in the highway difficult, if not impossible, though the flasher in mid-highway would be in full view. When the siren blew, this witness directed his attention to the top of the Wingate factory. His testimony is not useful.

The plaintiff produced only one witness who, he claims, placed Mrs. Rancourt on her feet on the station platform. This was Mrs. Burke, another employee in the Wingate factory. She was near the window, though apparently further from it than Mrs. Locke, leaning over and fixing a new spool of thread for the bobbin. She testified, "Well I heard this awful siren blow and as I heard it blow I turned to my right and I looked and I saw this object in front of me walking towards the platform of the depot and just then the train rushed by and I couldn't see what happened on the other side." The witness then was asked to mark on the plan the point where she saw the woman walking. She made a circle on the platform, about two feet westerly of the prolongation of the easterly line of the station.

From the easterly side of the station, and about twenty feet back from the front line of the building is a screened porch. Mrs. Burke went out after the accident and saw Mrs. Rancourt lying with her

feet towards the track and her head towards this porch. Mrs. Locke, working near Mrs. Burke, saw Mrs. Rancourt after the train passed lying at a point she marked on the plan several feet easterly from the east end of the station. Mrs. Locke's husband also saw the body at the side of the station, head towards the screened porch. The place thus described with approximate agreement by all the witnesses was some five or ten feet east of the place where Mrs. Burke placed the circle. It is hardly credible that the action of the train threw Mrs. Rancourt in a direction opposite to that in which the train was moving. So the marking must have been erroneous. This is not surprising, for Mrs. Burke was asked if she understood the plan and answered "No." The place where the body was found is consistent with a force applied while Mrs. Rancourt was still in the highway, and more consistent with it than with Mrs. Burke's marking.

But there is another reason for not crediting the evidence of the mark made by Mrs. Burke. She placed the mark directly after testifying that she saw Mrs. Rancourt walking *towards* the platform. The first question asked her, still on direct examination, after she made the circle, was "What was she doing." The answer was "walking along." "Q. In what direction? A. Toward the railroad, the depot." But if the deceased was at the point marked by Mrs. Burke, she was to all appearance (having in mind the line of vision) already some feet beyond the corner of the station, not going *towards* the depot, but already there. Thereafter, on cross-examination, and without leading, Mrs. Burke spoke of seeing "this object in white walking towards the station"; again as "walking toward the platform"; again "going ahead towards the depot"; yet again as "walking towards the platform of the depot"; and finally, "I told you I saw her walking towards the platform of the depot." In view of the reiteration on direct examination and five voluntary repetitions on cross-examination, it is incredible that the witness marked the plan with any understanding that in so doing she said in effect that she actually saw Mrs. Rancourt walking on the platform. That thought was plainly remote from her mind.

The plaintiff therefore failed, except by way of innuendo and speculation, to place the deceased on her feet beyond the bounds of the highway. If the speculation by the plaintiff should be correct that air currents from the train spun Mrs. Rancourt around and sucked her back so that the train sheared off a part of the back of her head, he has failed completely to furnish any credible evidence

that this happened while she was on the platform, rather than while she was in the highway. If it happened, it is just as likely that it happened just after she got across (if she ever did) and just before she reached the platform, while she was still a highway traveler and not even arguably entitled to special platform protection.

It is useless to speculate what was in the mind of the deceased. One speculation of the plaintiff is that she must have thought that the local train was approaching, that she could get across in front of it, that she must get across in order to board it, since the car-gates would be opened only on the north side. Even if she was bound for the station, it is inconceivable that a woman who lived in the neighborhood should not have in mind that the Flying Yankee preceded the local, and that the former had not yet arrived, while the latter was not due for ten minutes or more. But even assuming that she was mistaken as to all these points, the engineer could have had no notice of what was or was not in her mind in this respect, and could have had no reason to suppose that she would try to pass in front of his train until she "broke into a run," as he expressed it, or "walked much faster," as Mrs. McCarthy said. After that he did everything that he could. Even if contributory negligence were not a compelled finding and Mrs. Rancourt were findably excused because of her state of mind, the defendant could not be found at fault for not reading her mind sooner.

There was no evidence that the usual speed of the train at this point was improper or excessive in view of the needs of fast transportation the train was designed to meet and the excellent signals given to warn highway travelers. This was another issue on which the jury could have found for the plaintiff only by jumping at conclusions without evidence.

The absence of a regulation providing for the slowing down of trains upon approaching a grade crossing, when pedestrians are either in or entering the crossing, is treated by the plaintiff as negligence. The policy of the law with respect to protection is to require reasonable warning to pedestrians. In this instance, the defendant gave every possible warning—statutory whistling for nearly thirteen seconds, operating flashers and bells during all the time of the decedent's approach. The rule-making authority had every reason to suppose that all pedestrians except the deaf, the blind and the rash would refrain from crossing under such circumstances. The deaf and the blind they could reasonably expect to take extra precautions. To the rash, the defendant owes only the duty to take pre-

cautions after discovering that they are placing themselves unwittingly in a position of danger. The nonsuit was properly ordered. *Morier* v. *Hines, supra; Johnson* v. *Director General*, 81 N. H. 289; *Lavallé* v. *Railroad*, 89 N. H. 323, 326.

The exceptions to rulings on evidence have all been considered. A witness was not permitted to testify whether there was a custom for the care of persons on station platforms while expresses were about to pass. The exclusion was proper, since there was no reliable evidence that the deceased ever reached the platform walking. Another witness was not permitted to give expert testimony as to the operation of air currents. The reception of the evidence would be useless, since the jury could apply it only if it speculated as to Mrs. Rancourt's presence on the platform; if she was still in the highway, the testimony would be irrelevant. The court's refusal to hear this witness in chambers, in order to find out what he would say, was no breach of law or discretion. Other testimony, including medical testimony, was properly excluded in default of evidence that the deceased ever walked onto the platform.

The plaintiff excepted to the exclusion of a question whether there was any rule or regulation as to what an engineer should do with respect to speed upon approaching a grade crossing when pedestrians are either in or entering the crossing. No objection was made to the question when related to a crossing with flashers and bells. So related, it was answered that there was no such regulation. No reason appears for this exception being here.

The station agent was not permitted to say where he thought the deceased was going when he saw her approach the south flasher. What he thought as to her destination was immaterial. Even if he thought that she intended to come to the station to take the local due at 8:57, he had no possible notice that she would pass in front of the Flying Yankee at 8:45. Having no notice, he would have no occasion to warn her, even if it could be found that his warning would have been heeded by a woman who paid insufficient attention to her sensations of sight and hearing.

Evidence was excluded that the local usually stopped so as to block the crossing. If this could have furnished a motive for rash action by Mrs. Rancourt, it could not excuse it. No agent of the defendant could have known what was in her mind until, too late, they saw her hasten instead of stopping. The testimony excluded could have no tendency to establish a duty of the defendant, much less a breach of duty.

It was not error to exclude what happened to Mrs. Rancourt's eyesight twenty years before. The exclusion was made in discretion as too remote to be helpful, and full opportunity was given to show the state of her eyesight on the day of the accident. The deceased never wore her glasses outdoors, and was affirmatively shown to have reasonably good vision under the circumstances. If she had had some defect of vision, proof of it would have been immaterial on the issue of the defendant's negligence, since the defendant had no notice of it. On the issue of contributory negligence, there is no evidence that Mrs. Rancourt could not and did not hear the whistle and bells. Indeed, some warning registered in her mind, for she looked. Her attempt to "beat" the train after looking, assuming poor vision, diminished her care without excusing her. It was not error to exclude matter not useful to the plaintiff.

The striking out of an unresponsive answer was not error. Furthermore, the information stricken out was immediately supplied in answer to another question. Here again we fail to see any reason for the exception being here.

Nor was it error to exclude two argumentative questions. Both related to the point of contact on the train. The purpose was to argue that Mrs. Rancourt, from the nature of her injuries, must have been hit by the side of the train, rather than the head. If this had been shown, the plaintiff would not have been helped, since it would still have been as probable as otherwise that the contact occurred while she was in the highway, rather than on the platform.

*Judgment for the defendant.*

All concurred.